IN RE APPLICATION OF WISEMAN.

[Cite as *In re Application of Wiseman,* 135 Ohio St.3d 267, 2013-Ohio-763.]

*Attorneys—Character and fitness—History of criminal conduct, lengthy pattern of traffic offenses, and violation of fiduciary duties as a trustee weigh against approval of application for admission to the bar—Application to register as a candidate for admission to the bar disapproved.*

(No. 2012-1633—Submitted January 9, 2013—Decided March 7, 2013.)

ON REPORT by the Board of Commissioners on Character and Fitness of the Supreme Court, No. 523.

————————————

**Per Curiam.**

{¶ 1} Jay Michael Wiseman of Bowling Green, Ohio, is a 2010 graduate of the University of Toledo College of Law. He has applied as a candidate for admission to the Ohio bar and to take the Ohio bar exam. After conducting two separate hearings, a panel of the Board of Commissioners on Character and Fitness recommended that Wiseman's character be disapproved based on findings that he had demonstrated a disturbing pattern of violating the laws of this state and other states, engaged in prohibited self-dealing while serving as the fiduciary of a trust, knowingly violated the rules of the university he attended, and engaged in a pattern of lies and half-truths throughout the admissions process. The board adopted the panel's findings and recommendation. Having thoroughly reviewed the record, we adopt the board's findings of fact, disapprove Wiseman's pending applications, and forever bar him from seeking admission to the Ohio bar.

**The Underlying Improprieties**

{¶ 2} The admissions committee of the Columbus Bar Association first interviewed Wiseman on June 30, 2011, and recommended that his character and

fitness be approved. However, the board exercised its investigatory authority under Gov.Bar R. I(10)(B)(2)(e) and appointed a panel to hear the matter.

{¶ 3} At the first hearing, the panel addressed three primary areas of concern: (1) Wiseman's past criminal conduct (including incidents of underage possession of alcohol, destruction of property, public intoxication, and disorderly conduct), (2) his past-due debts, and (3) his extensive record of speeding and other traffic violations. At the panel's request following the hearing, Wiseman submitted an affidavit and a driving abstract that demonstrated he had not committed any further traffic offenses. Believing that Wiseman had satisfied his delinquent accounts and had corrected his bad driving habits, the panel recommended that he be approved to sit for the February 2012 bar exam. On February 14, 2012, the board approved his character, fitness, and moral qualifications.

{¶ 4} Before the bar exam, the board discovered that on January 10, 2012, Wiseman had been charged with receiving stolen property and sought an explanation from him. Wiseman claimed that he had no duty to report the matter until it had been finally resolved. Based upon this new charge and Wiseman's failure to disclose it, the board reopened the investigation and appointed a panel to conduct a second character and fitness hearing.

{¶ 5} The second panel revisited the issues addressed at the first hearing and found that while Wiseman's testimony at the first panel hearing painted him in the best possible light, the transcript of a character and fitness hearing conducted by the Florida Board of Bar Examiners on March 16, 2012, presented a different perspective on at least one of the incidents. For example, Wiseman testified before the Columbus Bar Association that while working as an independent contractor for the Toledo Blade, he was charged with assault—later reduced to disorderly conduct—following a fight with a competing newspaper carrier, who Wiseman alleged had pushed him when confronted for stealing

inventory from Wiseman's storage locker. Wiseman's testimony before the Florida Board of Bar Examiners, however, shows that Wiseman, who left his car and followed the other carrier, was the aggressor. In another incident, Wiseman reported to the bar association that he was charged with criminal damaging after two maintenance workers saw him drive across a lawn between two apartment complexes while delivering newspapers. The Florida transcript, however, suggests that Wiseman was "flooring it" and that he almost hit someone. Moreover, the Florida transcript contains a discussion of another incident in which a mother witnessed Wiseman drive recklessly, nearly hitting her preteen son who was delivering a competing newspaper. The mother reportedly chased Wiseman down and blocked his car in a driveway so that she could record his license plate number, but it does not appear that any charges were filed.

*Financial Matters*

{¶ 6} With regard to Wiseman's financial standing, the panel found that he had reported zero balances on most of his debts but that the report of the National Conference of Bar Examiners contradicted his statements. That report showed that at least one of the debts had been sold to collection and another still had a balance, but no payments had been made on the account, and that while Wiseman claimed to have filed a complaint with the Better Business Bureau about a third debt, the creditor reported that it had never received a complaint.

*Traffic Violations*

{¶ 7} The panel also took issue with Wiseman's significant traffic record. Wiseman received at least 13 citations—many of them for speeding, but others for an improper lane change, reckless operation, failure to control, improper turn, and driving under suspension. Wiseman attributed his poor record to time-management issues and reported that he had taken steps to rectify the problem. Moreover, Wiseman became argumentative during the first panel hearing and challenged the panel's concerns that his traffic record showed a lack

of concern for the safety of others, a selective disregard for the law, and a willingness to take shortcuts that might indicate a willingness to disobey other laws.

*Charge of Receiving Stolen Property*

{¶ 8}   Following the first panel hearing, Wiseman submitted an affidavit swearing that he had no additional traffic violations, but he neglected to inform the board that he had been charged with receiving stolen property after he purchased a Bowling Green State University faculty parking permit from a man outside the university parking office.   Wiseman testified that the man, who claimed to be a graduate student, offered to sell him a parking pass from a selection of student and faculty passes that purportedly belonged to him and his roommates.   Wiseman bought a faculty parking pass from the man for $10, instead of purchasing a commuter-student pass directly from the university for $60.   He admitted to the Florida Board of Bar Examiners that he knew that university rules provided that such passes were not transferrable, but he claimed that trading and purchasing parking passes was a common occurrence on the campus.  At his second panel hearing in Ohio, however, he claimed that he did not discover that his conduct violated university policy until *after* he was charged. The panel did not find this testimony credible.   Nor was the panel persuaded by Wiseman's explanation that he was waiting to fully resolve the matter before disclosing it to the office of bar admissions.

*Probate Litigation*

{¶ 9}   After his maternal grandparents died and left his mother a sizeable estate, Wiseman's parents established individual trusts and an irrevocable life-insurance trust that held a second-to-die life-insurance policy on the parents' lives that was originally intended to satisfy any estate taxes on the corpora of the other trusts.  Wiseman was the trustee of the life-insurance trust, and his parents were the trustees of their respective trusts.  When his mother died, his father became

4

the trustee of her trust. Wiseman's father has a lifetime interest in that trust, but Wiseman and his brother, Michael, are also beneficiaries.

{¶ 10} After the Toledo Blade terminated its contract with Wiseman and his wife, leaving them without income, Wiseman asked his father for $75,000 to support his family of six children while he attended law school. His father denied the request, and near this time Wiseman learned that his parents' wealth was held in the two trusts.

{¶ 11} Wiseman filed suit seeking an accounting, a distribution, and removal of his father as the trustee of his mother's trust. His father filed a counterclaim alleging that Wiseman and his wife had accepted a $160,000 loan from the trusts but had failed to execute a note and mortgage to secure the loan. Ultimately, the probate court refused to remove Wiseman's father as the trustee and granted the trusts a judgment against Wiseman and his wife for $160,000 plus 5.5 percent interest.

{¶ 12} Wiseman's legal arguments during that litigation and his testimony about that litigation were not always consistent. For example, in the litigation, Wiseman challenged the enforceability of the loan agreement, arguing that pursuant to the statute of frauds and the doctrine of promissory estoppel, neither he nor his wife had any obligation to repay the money that they used to buy their home. But at the panel hearing in this admissions matter, he acknowledged the need for a note and mortgage and indicated that he merely objected to some of the terms included in the documents presented for his signature. And at his hearing in Florida, he testified that he had filed the probate action because his father refused to give him the money he requested. But at the panel hearing, Wiseman claimed that his impetus to file the suit was his father's claim that the sons would receive nothing from the trusts until he had passed away, as well as his father's refusal to provide the sons with an accounting.

*Breach of Fiduciary Duties as Trustee of Life-Insurance Trust*

{¶ 13} When Wiseman's father decided to stop paying the premiums for the life insurance policy held by the life insurance trust, the policy had a cash value of approximately $100,000. As the trustee, Wiseman could elect to cash in the policy, thereby preserving the $100,000 cash value for himself and his brother, or he could use that cash value to maintain the policy. Wiseman initially used the cash value to pay the premiums, but when the cash value diminished to approximately $75,000, he elected to surrender the policy.

{¶ 14} Wiseman and his brother were both beneficiaries of the trust, and the trust allowed for the unequal distribution of trust assets in certain circumstances. Contrary to Wiseman's claims, however, the trust documents did not authorize him to unilaterally make distributions to himself. Rather, to prevent self-dealing, the trust documents required such distributions to be authorized by the next eligible successor trustee—a fact that was repeatedly brought to Wiseman's attention by his father's attorney and his brother's guardian ad litem.

{¶ 15} In the course of the ongoing probate litigation, which expanded to encompass Wiseman's management of the life-insurance trust, Wiseman claimed that he had distributed the trust funds to himself for "reinvestment." In a March 5, 2012 entry, the probate court ordered Wiseman to provide an accounting of the dissipated assets to his brother's guardian ad litem by April 4, 2012. Wiseman failed to comply with that order. He gave excuses for his failure to provide the documents, and when he did eventually provide them to the guardian as an e-mail attachment, he conditioned the guardian's opening of the attachment on the execution of a confidentiality agreement. Moreover, in response to a show-cause order filed on behalf of Wiseman's father seeking production of the accounting, Wiseman threatened to file a grievance against his father's counsel if he did not withdraw the motion. The probate court eventually ordered that all parties were

to receive copies of the accounting and threatened to hold Wiseman in contempt if he failed to provide it.

{¶ 16} In his March 2012 hearing before the Florida Board of Bar Examiners, Wiseman testified that he had absolute discretion to determine how the money was used. While he acknowledged that the money held in the life-insurance trust had been fully distributed, he left the Florida panel with the impression that his brother had received his share, by referring to his brother's investment portfolio, valued at approximately $120,000 to $140,000. The evidence is clear, however, that those funds are separate funds belonging to his brother, and none of those funds came from the life-insurance trust.

{¶ 17} Wiseman also advised the Florida Board of Bar Examiners that he had presented an accounting to his brother and his father and that although the accounting had been accepted by the probate court, the court had not yet ruled on the underlying claims. In fact, the court had issued its order directing him to provide an accounting nearly two weeks before his Florida admissions hearing. When questioned about this inconsistency in his prior testimony, Wiseman claimed that his wife had received the decision on March 12, 2012—four days before the hearing in Florida—but that she neither opened the envelope nor advised him that it had arrived. The panel did not find this testimony credible.

{¶ 18} Wiseman eventually admitted that he had spent all but $256 of the $75,000 trust fund for his own benefit, despite having received numerous warnings from his brother's guardian ad litem and his father's attorney that the trust did not authorize him to take all of the trust proceeds for himself. At the June 22, 2012 hearing in this matter, Wiseman, the guardian ad litem, and the father's counsel advised that the parties had reached a settlement regarding all claims related to the three trusts and that the settlement agreement would be read into the record on June 27, 2012.

**{¶ 19}** Although it appeared that these matters have been resolved to the satisfaction of the parties, Wiseman's conduct raises serious questions about his character and fitness to practice law.

## Recommendation

**{¶ 20}** Citing the conduct described above, as well as several other instances of obfuscation and less than credible testimony, the panel and board expressed concern that Wiseman believes he is above the law. Because he has demonstrated a disturbing inability to be honest, had given in to the temptation of misappropriating money held in trust for the benefit not only of himself, but also of his younger brother, and has failed to recognize the significant deficiencies in his character, the panel and board recommend that we disapprove his pending applications and that we prohibit him from reapplying as a candidate for the Ohio bar.

## Disposition

**{¶ 21}** An applicant to the Ohio bar must prove by clear and convincing evidence that he or she "possesses the requisite character, fitness, and moral qualifications for admission to the practice of law." Gov.Bar R. I(11)(D)(1). "A record manifesting a significant deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for disapproval of the applicant." Gov.Bar R. I(11)(D)(3).

**{¶ 22}** In determining whether the record demonstrates such a deficiency, we consider a number of factors, including but not limited to an applicant's pattern of disregarding the laws of this or any other state; failure to provide complete and accurate information regarding his or her past; false statements, including omissions; acts involving dishonesty, fraud, deceit, or misrepresentation; neglect of financial responsibilities; and violation of a court order. *See, e.g.*, Gov.Bar R. I(11)(D)(3)(f), (g), (h), (i), (k), and (m).

**{¶ 23}** Wiseman has engaged in a lengthy pattern of traffic offenses and a less lengthy pattern of criminal conduct that demonstrate a perverse disregard for the safety and well-being of others. He has taken shortcuts, knowingly violated rules, sued his father, who had expressed legitimate concerns about his financial responsibility, and knowingly violated his fiduciary duties as a trustee by misappropriating $75,000 held in trust. He has violated court orders and threatened disciplinary action, contempt, and other legal actions against an attorney who sought to ethically represent his client within the bounds of the law. Moreover, he has engaged in a pervasive pattern of lies and omissions throughout this admissions process in an effort to conceal his past conduct and convince this court that he possesses the requisite character, fitness, and moral qualifications to practice law in the state of Ohio. Given the seriousness of Wiseman's conduct and character deficits, we agree that he has not established, nor will he be able to establish in the future, that he possesses the requisite character, fitness, and moral qualifications to practice law in this state. *See, e.g.*, *In re Application of Kapel*, 87 Ohio St.3d 122, 717 N.E.2d 704 (1999) (forever barring an applicant from being admitted to the practice of law based on a demonstrated pattern of disregard or willful disobedience of societal constraints and his ongoing propensity to violate rules and regulations).

**{¶ 24}** Accordingly, we disapprove Wiseman's pending application and forever bar him from applying for the privilege to practice law in this state.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Jay Michael Wiseman, pro se.

Taft, Stettinius, & Hollister, L.L.P, and Michael Alan Byers, for the Columbus Bar Association.